## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| MARISSETT TOLENTINO and FRANCISCO TOLENTINO, individually and as representatives of the Estate of ISABELLA TOLENTINO, | § § § § § § | Civil Action No. 3:14-cv-00017<br>Jury<br><br>(Removed Case No. 13-CV-1553, 122nd District Court of Galveston County, Texas) |
| Plaintiffs | § § | |
| v. | § § | |
| HEALTH CARE SERVICE CORP. d/b/a BLUE CROSS BLUE SHIELD OF TEXAS, A DIVISION OF HEALTH CARE  SERVICE CORP., ALLIANZ GLOBAL ASSISTANCE, and BLUECARD WORLDWIDE | § § § § § § § § | PLAINTIFFS' AMENDED COMPLAINT |
| Defendants. | § | |

## PLAINTIFFS MARISSETT AND FRANCISCO TOLENTINO'S AMENDED COMPLAINT

TO THE HONORABLE GREGG COSTA, U.S. CIRCUIT JUDGE:

COMES NOW Plaintiffs, MARISSETT and FRANCISCO TOLENTINO,

individually and as representatives of the Estate of ISABELLA TOLENTINO,

complaining of Defendant, HEALTH CARE SERVICE CORP. d/b/a BLUE

CROSS BLUE SHIELD OF TEXAS, A DIVISION OF HEALTH CARE

SERVICE CORP., ALLIANZ GLOBAL ASSISTANCE, and BLUECARD WORLDWIDE,  and in support thereof show the Court as follows:

**PARTIES**

1. Plaintiffs, MARISSETT and FRANCISCO TOLENTINO, are individuals who are resident citizens of the State of Texas. Plaintiffs are the parents of Isabella Tolentino, their deceased daughter.

2. Defendant, HEALTH CARE SERVICE CORP. d/b/a BLUE CROSS BLUE SHIELD OF TEXAS, A DIVISION OF HEALTH CARE SERVICE CORP., is incorporated under the laws of the State of Illinois and is, therefore, a citizen of the State of Illinois. This Defendant has appeared and answered in this case through its attorneys of record.

3. Defendant, ALLIANZ GLOBAL ASSISTANCE, has its principal place of business in Richmond, Virginia and is, therefore, a citizen of the State of Virginia. It may be served with process at 9950 Maryland Dr., Richmond, Virginia 23233.

4. Defendant, BLUECARD WORLDWIDE, has its principal place of business in Miami, Florida and is, therefore, a citizen of the State of Florida. It can be served with process at BlueCard Worldwide Service Center, P.O. Box 261630, Miami, Florida 33126.

-2-

**JURISDICTION**

5. The Court has jurisdiction over the lawsuit under 28 U.S.C. §1332(a)(1) because Plaintiffs and Defendants are citizens of different U.S. states, and the amount in controversy exceeds $75,000.00, excluding interest and costs.

**VENUE**

6. Pursuant to 28 U.S.C. §1441(a), venue is proper in the Southern District of Texas Galveston Division, as it is the federal judicial district and division embracing the place where the original, removed state court case was pending.

**FACTUAL BACKGROUND**

7. Plaintiffs, Marissett and Francisco Tolentino and their daughter Isabella ("Tolentino Family"), went on a vacation to the Dominican Republic expecting to relax and build lasting memories; instead, they returned early to mourn the unfortunate and untimely death of their six-year old daughter, Isabella Tolentino. Defendants, including but not limited to Health Care Service Corporation, doing business as Blue Cross Blue Shield of Texas ("BCBSTX"), Allianz Global Assistance, and BlueCard Worldwide, along with their agents and affiliates, participated in and influenced key health-care treatment decisions that resulted in Isabella's death at Miami Children's Hospital in Miami, Florida. Defendant Health Care Service Corporation runs an elaborate scheme designed to mask its true

-3-

identity to its policyholders, operating through unincorporated divisions and using third party vendors as its agents, including the additional Defendants herein, when dealing with its customers.   The Tolentino Family's health insurance plan with BCBSTX was established by Plaintiff Marissett Tolentino's employer, UT Galveston, which is a governmental entity where she works as a nurse.

### *Plaintiffs Rely on BCBSTX's Worldwide Service*

8. Plaintiffs were weary of travelling abroad without first being prepared for unforeseen medical emergencies but found comfort in that BCBSTX offered a world class worldwide healthcare coverage service through BlueCard Worldwide that included the Dominican Republic. BCBSTX and BlueCard Worldwide represented that both an outpatient health-care provider at the Dreams Palm Beach Resort and that a nearby inpatient clinic were in the BCBSTX or BlueCard Worldwide network. While in Punta Cana, Dominican Republic, Isabella experienced discomfort and sharp pains in her stomach, in addition to occasional chills and fever. The Tolentino Family immediately consulted with the health-care provider at the Dreams Palm Beach Resort, where the family was staying. Based on the diagnosis of Isabella's condition, the resort's physician recommended that Isabella be taken to the Dominican clinic, which was also listed as an in-network or "recommended" provider by BCBSTX and BlueCard Worldwide. There was some

connection between the providers, as the resort's outpatient provider would bill his services through the clinic.

9. The staff at the clinic performed various tests and diagnosed Isabella with appendicitis, which would require surgery. The Tolentino Family was not comfortable with the idea of subjecting their daughter to a surgical procedure in a foreign clinic that may not meet the standards of professionalism and care of an American hospital, and they expressed their desire to have Isabella transferred to the United States repeatedly. Miami, Florida is a one-hour flight away from Punta Cana, so the transfer would have been quick and easy to complete for BCBSTX and its agents.

### BCBSTX's Opinion that Transfer Was Unnecessary and that The Clinic Was Competent

10. The Tolentino Family consulted with Isabella's doctors in the United States. Isabella's pediatrician agreed that a commercial flight would be too risky given her condition and instead recommended that she be flown to the United States on a medical jet immediately.

11. The Tolentino Family spoke to a BCBSTX representative about this possibility and were told that the medical jet service was unavailable to them at that time. In the opinion of the BCBSTX, as communicated by the representative, the medical condition was not severe enough to warrant the transfer to the United

States. The BCBSTX representative also dismissed the Tolentino Family's concerns about the clinic, citing its prior dealings with the hospital and stating that it trusted the foreign clinic's expertise. The Tolentino family objected strenuously and pressed by saying that this was Isabella's first surgery, stressing how young she was and that appendicitis is life threatening. Despite the Tolentino Family's pleas to the contrary, BCBSTX and its agents refused to change their opinion and to pay for Isabella's transfer. The denial of this service left the Tolentino Family with no choice but to have Isabella's surgery performed at the clinic.

### The Clinic Performs the Procedure and Isabella's Condition Worsens

12.   Doctors at the clinic subsequently administered anesthesia and performed the procedure on Isabella. The doctor informed the Tolentino Family that Isabella would wake up soon; however, hours passed and there was still no news. The Tolentino Family was not given updates but rather only saw the commotion of more doctors and X-ray machines entering Isabella's room. Finally, the doctors informed the Tolentino Family that Isabella's condition was very unstable. She had not awoken from the anesthesia. Isabella had vomited while unconscious, and blood had come up through the intubation. The doctors had not removed the tube, and she displayed signs of low oxygen levels. Plaintiff Marissett Tolentino, who is a nurse, pointed out the signs of low oxygen to the doctors;

however, clinic staff told them not to worry. The doctors also stated that Isabella would be transferred to the Intensive Care Unit shortly, yet she was not transferred until around midnight later that day, hours later.

13. The next morning, around 7 a.m., Isabella was still in critical condition. By this time, BCBSTX and its agents were well aware of the severity of the matter yet made no effort to contact the Tolentino Family or to immediately send the jet for her transfer. The Tolentino Family had no idea that BCBSTX was being apprised of the situation, until 5:30 p.m. that day when clinic staff told Plaintiffs that BCBSTX had called in early that morning regarding a potential transfer to the United States.

14. BCBSTX, Allianz Global Assistance, and BlueCard Worldwide and its agents were fully aware of the severity of Isabella's condition but still had not authorized the medical jet transfer. They insisted on delaying the transfer until the clinic doctors sent a report to the doctors in Miami, the destination for Isabella's transfer. Clinic staff unreasonably delayed in sending this report and claimed to have difficulties communicating with Miami. Throughout this whole process, precious time that could have saved Isabella's life was being wasted.

15. Once the report was finished, the clinic still refused to authorize the transfer until it received payment for their services. It was not until around

midnight that day when the clinic was ready for the transfer.

### *BCBSTX's Unreasonable Delay and Lack of Urgency Leads to Isabella's Death*

16. The Tolentino Family immediately communicated with the BCBSTX representatives to set up the medical jet upon learning that the clinic was ready for the transfer; even then, BCBSTX displayed no sense of urgency in getting Isabella to the United States to save her life. In fact, BCBSTX and Allianz Global Assistance refused to send the medical jet until the Tolentino Family could send a payment to them as well.

17. After hours of unreasonable delay, a BCBSTX representative then informed the Tolentino Family that it would not be sending the medical jet until "early the next morning." Plaintiffs were stunned at BCBSTX's lack of urgency, but awaited anxiously as Isabella was sedated and fighting for her life. BCBSTX represented that the medical jet would arrive at 10 a.m. the next day.

18. However, the BCBSTX medical jet did not arrive until 2 p.m. The medical flight staff from Miami immediately recognized that something had to be done to try to stabilize Isabella. They checked the intubation and realized that it was plugged with mucus. Moreover, the tube itself was entirely too small for someone of her age and size. BCBSTX, Allianz Global Assistance, and BlueCard Worldwide could have avoided the medical negligence that the Tolentino Family

feared when they begged BCBSTX to make the transfer sooner. This was also the reason why the Tolentino Family never wanted to have the foreign clinic perform the procedure on their young daughter to begin with. BCBSTX, Allianz Global Assistance, and BlueCard Worldwide failed to recognize the clinic's inadequacy and should have transferred Isabella to the United States before any of this occurred, given the life-threatening nature of the appendicitis procedure. The medical flight staff was able to stabilize her, and the jet left Punta Cana around 4 p.m.

19. The doctors in Miami immediately recognized that the primary concern was the damage to her brain resulting from the oxygen deprivation that ensued from the wrongful intubation. They ran CT scans and other tests and determined that the damage was substantial. Moreover, Isabella had also begun to have seizures as a result. In fact, the Tolentino Family was horrified to be present for one of Isabella's seizures where her eyes were twitching, and she was seemingly chewing on her intubation tube.

20. The doctors in Miami discussed the severity of Isabella's condition with the Tolentino Family and stated that what the foreign clinic reported was mostly inconsistent with their observations. Unfortunately, entirely too much time had been wasted. With every second that passed without detecting the wrongful

intubation, Isabella's brain suffered incremental damage. Isabella was pronounced dead at the hospital in Miami shortly thereafter.

## CONDITIONS PRECEDENT

21. All conditions precedent have been performed or have occurred as required by state law. Pursuant to Texas Civil Practice and Remedies Code section 88.003(f), Plaintiffs need not submit this claim for an independent review because harm has already occurred as a result of the Defendants' conduct, and an independent review would not be beneficial to the Plaintiffs.

## CLAIMS

### COUNT 1: NEGLIGENCE UNDER THE HEALTH CARE LIABILITY ACT

22. The Tolentino Family re-alleges the facts as set forth above and incorporates them by reference as if pled specifically herein. Moreover, Plaintiffs assert that Defendants are liable for the actions of their respective agents and representatives through principles of the law of agency or *respondeat superior*, as appropriate.

23. Plaintiff Marissett Tolentino is an insured in a health-care plan managed by BCBS.

24. BCBSTX, Allianz Global Assistance, and BlueCard Worldwide are health insurance carriers.

-10-

25. Plaintiffs' health insurance plan with Defendants was established and is maintained by Plaintiff Marissett Tolentino's employer, UT Galveston, a governmental entity.

26. Defendants violated the Health Care Liability Act, codified at Texas Civil Practice and Remedies Code §§88.001 -88.0015, when they failed to exercise the degree of care that a health insurance carrier of ordinary prudence would use under the same circumstances in participating in or influencing the health-care treatment decision regarding the Tolentino Family. The Defendants were under a duty to ensure that facilities or institutions within its network were sufficiently competent not only to perform the surgery, but also to administer the anesthesia for a procedure such as the one conducted. Defendants were also under an obligation not to place their interests ahead of those of the insured.

27. Here, Defendants either made a misrepresentation regarding the qualifications, or they failed to ascertain whether the foreign clinic was qualified, in which case there was an obligation to transfer Isabella to a known qualified institution.

28. Defendants heavily influenced the treatment decision of having Isabella's surgery performed at the foreign clinic instead of paying for the transfer to Miami. Defendants provided their opinion on the necessity for emergency

services, such as a transfer by medical jet, and on the quality and expertise of the foreign clinic's work.

29. Moreover, when the procedure was performed and the circumstances worsened, Defendants were on notice that the facility they claimed within their networks was not sufficiently competent to meet the obligations to the insured. Despite that fact, Defendants still failed to act promptly and with the proper urgency to send the medical jet for the transfer and continued to place its interests ahead of those of the insured.

30. Defendants' lack of ordinary care proximately caused injuries including, but not limited to, those that resulted in the Plaintiff's death and emotional pain and suffering for the Tolentino Family.

31. The Tolentino Family seeks unliquidated damages within the jurisdictional limits of this Court.

32. The Tolentino Family's injuries resulted from Defendants' gross negligence, which entitles the Tolentino Family to exemplary damages pursuant to Texas Civil Practice & Remedies Code §41.003(a).

### COUNT 2: DECEPTIVE TRADE PRACTICES ACT- LAUNDRY LIST VIOLATIONS

33. The Tolentino Family re-alleges the facts as set forth above and incorporates them by reference as if pled specifically herein. Moreover, Plaintiffs

assert that Defendants are liable for the actions of their respective agents and representatives through principles of the law of agency or *respondeat superior*, as appropriate.

34. In the alternative, or in addition, to other counts, Defendants violated the Deceptive Trade Practices Act, codified at Texas Business and Commerce Code §§17.46 -17.63 (DTPA), when they misrepresented eligibility for the medical jet transfer. Defendants also misrepresented the time of arrival for the medical jet when it was subsequently approved. The Tolentino Family was at the mercy of Defendants and depended on a prompt arrival. Upon information and belief, Defendants further misrepresented the identity of third-party vendors or other companies who communicated with the Tolentinos and made crucial decisions about their fate. Defendants held the vendors out as being Blue Cross Blue Shield of Texas.

35. Plaintiffs were consumers as defined by the DTPA because they sought and acquired a service with Defendant, a health insurance provider.

36. The Tolentino Family's health insurance plan with Defendants was established and is maintained by Plaintiff Marissett Tolentino's employer, UT Galveston, a governmental entity.

37. Defendants' actions or statements constituted a false, misleading, and

deceptive act that was relied upon by the Tolentino Family, to their detriment. Specifically, Defendants initially denied to the Tolentino Family a service that they clearly were eligible for under their policy. This forced Isabella's procedure to be performed in substandard conditions, which led to her death. Moreover, once it was clear that they were required to pay for the medical jet, Defendants misrepresented that it would be there "early the next morning" by 10 a.m. The jet did not actually arrive until 2 p.m. Even the slightest delays were critical in affecting Isabella's condition, as the defective tube could have been detected earlier and possibly saved her life. Moreover, Defendants lied to the Tolentino Family by holding out third-party vendors or other companies as being Blue Cross Blue Shield of Texas when they were not. The statements and actions were made knowingly.

38. The Tolentino Family relied on Defendants' misrepresentations to their detriment, as they resulted in Isabella's death.

39. Defendants' actions were a producing cause of the Tolentino Family's damages.

### COUNT 3: DECEPTIVE TRADE PRACTICES ACT- BREACH OF EXPRESS OR IMPLIED WARRANTY

40. All preceding allegations are incorporated herein by reference. Moreover, Plaintiffs assert that Defendants are liable for the actions of their

-14-

respective agents and representatives through principles of the law of agency or *respondeat superior*, as appropriate.

41. Defendants' actions or statements violated the DTPA because they were in breach of the express or implied warranties in the Tolentino family's insurance policy. Defendants had an affirmative duty to their members to ensure the competency of its in-network facilities and to not place their interests ahead of the insured. In addition, an express warranty was created when Defendants, through a representative, stated that the medical jet would be there "early the next morning," when in fact it was not there until 2 o'clock in the afternoon. Defendant also breached their implied warranty of merchantability and their obligation to place their interests on equal footing with those of the policy holders. These statements or actions were made knowingly.

42. Defendants' actions and statements were a producing cause of the Tolentino Family's damages.

## COUNT 4: DECEPTIVE TRADE PRACTICES ACT- UNCONSCIONABILITY

43. All preceding allegations are incorporated herein by reference. Moreover, Plaintiffs assert that Defendants are liable for the actions of their respective agents and representatives through principles of the law of agency or *respondeat superior*, as appropriate.

-15-

44. Defendants' actions or statements were unconscionable, and therefore in violation of the DTPA, because Defendants took advantage of the Tolentino Family's lack of knowledge, ability, experience, or capacity to a grossly unfair degree. Defendants had a greater knowledge concerning the adequacy and competency of the institutions within its network, or a greater ability to obtain such knowledge, as compared to the Plaintiffs. The Tolentino Family was at the mercy of Defendants for a decision on whether it was safe to remain in the Dominican Republic or whether it was necessary to make the short trip to Miami to ensure the quality and competency of an American facility. Defendants were aware of the severity of Isabella's condition, yet they knowingly delayed the process and placed unnecessary administrative pre-requisites above the urgency required to save Isabella's life.

45. Defendants' actions were a producing cause of the Tolentino Family's damages.

### COUNT 5: DECEPTIVE TRADE PRACTICES ACT- TEXAS INSURANCE CODE

46. All preceding allegations are incorporated herein by reference. Moreover, Plaintiffs assert that Defendants are liable for the actions of their respective agents and representatives through principles of the law of agency or *respondeat superior*, as appropriate.

47. Defendants' actions or statements were a violation of the DTPA because of their violation of the Texas Insurance Code. The Texas Insurance Code was violated because there was a misrepresentation relating to the business or practice of insurance when Defendants misrepresented eligibility for the medical jet transfer, and the time of arrival for when it was finally approved. Defendants further misrepresented the competency of its in-network institution to the Tolentino Family and failed to uphold its duties to ensure the competency of its in-network institution or to transfer if that competency was unclear or unknown.

48. Defendants' actions or statements were a producing cause of the Tolentino Family's damages.

## COUNT 6: TEXAS INSURANCE CODE CHAPTER 541 VIOLATION

49. All preceding allegations are incorporated herein by reference. Moreover, Plaintiffs assert that Defendants are liable for the actions of their respective agents and representatives through principles of the law of agency or *respondeat superior*, as appropriate.

50. Defendants made misrepresentations relating to the business or practice of insurance when they misrepresented eligibility for the medical jet transfer and the time of arrival for when it was finally approved. Defendants further misrepresented the competency of its in-network institution to the Tolentino

Family and failed to uphold its duties to ensure the competency of its in-network institution or transfer if that competency was unclear or unknown.

51. Defendants' actions or statements were a producing cause of the Tolentino Family's damages.

### COUNT 7: WRONGFUL DEATH

52. Plaintiffs bring this wrongful death action pursuant to TEX. CIV. PRAC. & REM. CODE ANN. CH. 71. Isabella Tolentino was an innocent child at the time of her death.  During her short time in this life, she brought incalculable joy to the lives of Plaintiffs, amongst others.  At the time of her death, she was the daughter of Franscico and Marissett Tolentino.  Plaintiffs have experienced the one loss that is every family member's greatest fear; they have buried their beloved daughter.

53. Plaintiffs have suffered, and will continue to suffer, a loss of consortium and damage to the child/parent relationship, including the loss of love, affection, solace, comfort, companionship, society, assistance, and emotional support from their daughter as a proximate result of the negligence of Defendants.

54. As a proximate cause of the negligence of Defendants, Plaintiffs have suffered severe mental depression and anguish, grief, and sorrow as a result of the death of Isabella Tolentino, and in all reasonable probability will continue to suffer such indefinitely into the future.

## COUNT 8: SURVIVAL ACTION

55. Plaintiffs bring this survival action in their capacity as the legal heirs of decedent pursuant to TEX. CIV. PRAC. & REM. CODE ANN. § 71.021.  The negligent acts of Defendants were a proximate cause of tremendous conscious pain, suffering, terror, mental anguish and the eventual death of Isabella Tolentino. The estate of Isabella Tolentino is entitled to recover the following damages:

1.    Conscious physical pain and suffering suffered by Isabella Tolentino prior to her death;
2.    Conscious mental anguish suffered by Isabella Tolentino prior to her death;
3.    Funeral and burial expenses for Isabella Tolentino; and
4.    Future lost earnings of Isabella Tolentino.

## JURY DEMAND

56. Before removal of this action, Plaintiffs expressly demanded a jury trial in accordance with Texas law; therefore, a request for a trial by jury on all issues in this matter is timely pursuant to Federal Rule of Civil Procedure 81(c)(3)(A).

## DAMAGES OF PLAINTIFFS

57. As a direct and proximate result of Defendants' conduct, Plaintiffs sustained damages for which they seek compensation under the law as follows:

a.    physical pain and suffering suffered by Isabella.

b.    mental anguish sustained in the past and, in all reasonable probability, that the Tolentino Family will sustain in the future;

-19-

 c. economic loss in the form of great expenses and loss of Isabella's earning capacity and potential;

 d. three times economic plus mental anguish damages for the knowing violations of the DTPA;

 e. exemplary damages pursuant to Texas Civil Practice & Remedies Code § 41.003(a).

 f. all other elements of damage to which they may show themselves to be entitled to under the law.

## ATTORNEY FEES & COSTS

58. Plaintiffs are entitled to an award of attorney fees and costs pursuant to Texas Business and Commerce Code §17.50(d).

## PRAYER

59. WHEREFORE, Plaintiffs respectfully pray that this Court enter a judgment for the following:

 a. assuming jurisdiction of this action;

 b. issuing judgment against Defendants for Plaintiffs' actual damages as set forth above;

 c. pre-judgment and post-judgment interest as provided by law;

 d. costs of court; and

 e. such other and further relief to which Plaintiffs may be entitled.

Respectfully submitted,

BY: */s/ Jacob A. De Leon*

-20-

Jacob A. De Leon
jdeleon@deleonlawfirm.com
Attorney-in-Charge
Texas Bar No. 24036465
SDTX Bar No. 36978
De Leon Law Firm
1331 Lamar St., Ste 1250
Houston, Texas 77010
Telephone:   (713) 228-7300
Facsimile:    (713) 228-7302

Counsel for Plaintiffs Marissett and
Francisco Tolentino, individually and
as representatives of the Estate of
Isabella Tolentino

Of Counsel:

Manuel H. Hernandez
mhernandez@deleonlawfirm.com
Texas Bar No. 24087712
SDTX Bar No. 2209488
De Leon Law Firm
1331 Lamar St., Ste 1250
Houston, Texas 77010
Telephone:   (713) 228-7300
Facsimile:    (713) 228-7302

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 7th day of July, 2014, a true and correct copy of the foregoing pleading was served in accordance with the Federal Rules of Civil Procedure on the following:

Lisa M. Noller
Daniel W. Werly
Foley & Lardner LLP
321 North Clark Street, Suite 2800

-21-

Chicago, Illinois 60654

John B. Thomas
Eric Grant
Hicks Thomas LLP
700 Louisiana Street, Suite 2000
Houston, Texas 77002
Telephone: (713) 547-9100
Facsimile: (713) 547-9150

*/s/ Jacob A. De Leon*
Jacob A. De Leon